UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**Hon. Hugh B. Scott**

08CR281S

v.                                                    **Report &**
**Recommendation**

Joseph Tigano III, and
Joseph Tigano, Sr.

Defendants.

Before the Court are various omnibus motions filed on behalf of the respective

defendants (Docket Nos 26, 51, 52, 67, 74, and 108).[1]

## Background

On October 2, 2008, the Grand Jury issued an Indictment charging Joseph Tigano III  and

Joseph Tigano, Sr. with various drug trafficking offenses. Both defendants are charged with the

unlawful manufacture of 1,000 or more marijuana plants [Count 1]; the unlawful possession with

---

[1]   The various discovery requests by the respective defendants have been resolved in
prior Orders. The parties shall notify the Court if any discovery issues remain. This Court has
recused itself with respect to the defendants' pretrial motions to extent the defendants challenged
the validity of a search warrant issued by this Court.  Those motions were resolved before
another United States Magistrate Judge. The instant Report & Recommendation deals only with
the defendants' motions to suppress certain statements made by the respective defendants.

1

the intent to distribute marijuana [Count 2]; the unlawful use of a place to manufacture and

distribute marijuana [Count 3]; conspiring to commit the offenses set forth in Counts 1 through 3

[Count 4]; and possession of a firearm in furtherance of the drug trafficking offenses [Count 5].

Joseph Tigano III is also charged with unlawful possession of firearms [Count 6]. The Indictment

also asserts various forfeiture counts [Counts 7 and 8].

The defendants each seek the suppression of any statements allegedly made by them at

the time of their arrest on July 8, 2008.

A suppression hearing was held on May 31, 2011. Gene Nanna, a Special Agent with the

United States Drug Enforcement Administration ("DEA") testified that he was part of a task

force that executed a search warrant for 30 Mill Street in Cattaraugus, New York on July 8, 2008.

A SWAT team from the Federal Bureau of Investigation ("FBI") entered the building at

approximately 6:00 a.m. (Docket No. 112 at pages 6, 26).[2] During the execution of the search

warrant, at approximately 7:45 a.m., Nanna had a conversation with Joseph Tigano III after he

had been arrested by other members of the task force. (Docket No. 112 at pages 6-7).  Nanna

testified that prior to conversing with Joseph Tigano III, Nanna advised Joseph Tigano III of his

rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), using a DEA form.[3] (Docket No.

---

[2]   According to Detective Cory Higgins, who lead the task force for the execution of the search warrant, somewhere between 45 and 50 officers participated in the execution of the search warrant. (Docket No. 112 at page 83).

[3]   The copy of DEA Form13A, a Miranda warnings card, kept by Nanna in his wallet which was used in this regard, was admitted into evidence as Government's Exhibit 1. (Docket No. 112 at pages 8, 14).

112 at page 8).[4] Nanna testified that Joseph Tigano III acknowledged that he understood his

rights as explained to him and that he agreed to answer questions at that time. (Docket No. 112 at

page 9). According to Nanna, task force agents Chris Clark, Cory Higgins and Jamie Preston

were also present during the interview with Joseph Tigano III. (Docket No. 112 at pages 7, 9).

The interview took place either in a bedroom or the living room area on the second floor of the

building where Joseph Tigano III had been arrested. (Docket No. 112 at pages 7, 19).  During the

search, it appears that agents found an indoor marijuana grow operation in the basement of the

warehouse including mature plants, cloned plants, and various rooms set up for the different

stages of growth for marijuana processing. The agents also found various marijuana processing

devices and located approximately 20 pounds of marijuana in a safe on the second floor of the

building. (Docket No. 112 at pages 10-11).  Nanna stated that he asked Joseph Tigano III about

what they found in the warehouse and that Joseph Tigano III admitted that "the grow operation

was his."  (Docket No. 112 at page 10). Nanna also testified that Joseph Tigano III stated that his

father, Joseph Tigano, Sr., was also "involved in the marijuana grow operation." (Docket No.

112 at 13). Finally, Joseph Tigano III told the agents about the marijuana located in the safe on

the second floor, as well as money found in another safe in a room across from the bedroom.

Nanna stated that Joseph Tigano III signed a consent to search form with respect to those two

locations. (Docket No. 112 at page 14).[5]

---

[4]   Nanna testified that he did not know if anyone had advised Joseph Tigano III of his rights prior to the time Nanna did. (Docket No. 112 at page 18).

[5]   Nanna testified that the other agents present also posed questions to Joseph Tigano III. For example, Preston, an agent with the Internal Revenue Service assigned to the task force, asked Joseph Tigano III questions regarding the proceeds of the sale of marijuana. (Docket No. 112 at page 12).  Nanna could not recall specific questions asked by the other agents, although

On cross-examination, Nanna acknowledged that Joseph Tigano III was handcuffed during the interview, and that Nanna and the other three officers were dressed in protective gear and had weapons on them at the time. (Docket No. 112 at page 20).  Nanna did not recall anyone asking Joseph Tigano III about guns that were found on the premises. (Docket No. 112 at page 23).  Nanna testified that he has no recollection of whether Joseph Tigano III asked to see the search warrant and Nanna denied telling Joseph Tigano III: "answer our questions and I'll show you a copy of the search warrant." (Docket No. 112 at page 24).  Nanna testified that he did not know whether Joseph Tigano III had clothes on when he was arrested by the initial entry officers, but that Joseph Tigano III had clothes on when Nanna first saw him. (Docket No. 112 at page 25).

Special Agent Preston also testified at the hearing. Preston testified that he first saw Joseph Tigano III in a "lounge area" on the top floor of the building. (Docket No. 112 at page 31).  Preston stated that he was informed that Joseph Tigano III had been already advised of his rights at that time. (Docket No. 112 at page 32). Preston testified that he asked Joseph Tigano III questions relating to financial matters. According to Preston, Joseph Tigano III answered most of the questions posed but that Joseph Tigano III refused to answer questions relating to any possible organized crime connections. (Docket No. 112 at page 33). Preston testified that he recalled Joseph Tigano III stating that he had money and marijuana in a safe, and that Joseph Tigano III signed a consent form with respect to the search of the safe. (Docket No. 112 at page 34).  Preston stated that he recalled taking notes at the time of the interview. (Docket No. 112 at

---

Nanna did recall that agents asked Joseph Tigano III "about some relationship with organized crime and their involvement in indoor marijuana grow operations in different parts of the state outside of western New York." (Docket No. 112 at page 13).

page 36). He was directed to go to his office and retrieve the notes. (Docket No. 112 at page 38).

When he returned, Preston testified that he could not locate the notes and that he could not

explain why the notes were not with the other documents in his file. (Docket No. 112 at pages

100-101).  Preston stated that the interview lasted no more than 40 minutes. (Docket No. 112 at

page 104).

Christopher Clark, an officer with the Niagara Falls Police Department assigned to the

DEA task force, testified at the hearing as well. Clark also testified that he was part of the task

force search team and observed Joseph Tigano III in the living room area of the second floor of

the building and was present for at least part of the interview with Nanna, Higgins and Preston.

(Docket No. 112 at page 41, 43). Clark stated that he observed Nanna advise Joseph Tigano III of

his Miranda rights, that Joseph Tigano III acknowledged that he understood his rights and agreed

to answer questions. (Docket No. 112 at page 42). Clark testified that by the time he arrived at

the building (which was after the entry team had secured the building), Joseph Tigano, Sr.  had

already been placed in a patrol car. (Docket No. 112 at page 49).

Detective Cory Higgins of the Cattaraugus County Sheriff's Office also testified at the

suppression hearing. He stated that the warrant was executed by two SWAT teams, the

Cattaraugus County Sheriff's Special Response Team, assisted by the FBI's SWAT team.

(Docket No. 112 at page 52). He testified that Joseph Tigano III was first encountered in the

hallway just outside of his bedroom area.[6] (Docket No. 112 at page 53). He was ordered to the

---

[6]  There appears to be no dispute that this occurred on what most witnesses have
described as the second floor of the building at 30 Mill Street.  Higgins' testimony reflects that
he considered the basement to be the "first level, " the ground level to be the "second floor" and
the upper level to be the "third floor." (Docket No. 112 at page 54).  Thus, to the extent Higgins
refers to the "third floor" he is referring to what the other witnesses have described as the

ground to be secured. (Docket No. 112 at page 54). Higgins testified that Joseph Tigano III did

not have clothes on when he was secured, so they got some clothes for him and allowed him to

get dressed. (Docket No. 112 at page 58). Joseph Tigano III was then brought into what Higgins

referred to as the "TV room."[7] (Docket No. 112 at page 58). Higgins testified that he was present

towards the end of the interview of Joseph Tigano III by Nanna, Preston and Clark. (Docket No.

112 at pages 65, 77). He stated that he asked Joseph Tigano III questions relating to whether

Joseph Tigano III had associations with members of organized crime in the New York City area,

but that Joseph Tigano III would not answer such questions[8] but did state: "It doesn't matter ...

you signed my death warrant by just being here." (Docket No. 112 at pages 65-66). Higgins

stated that Joseph Tigano III provided the officers with the combination to a large vault. (Docket

No. 112 at page 67). Higgins acknowledged that at the ime Joseph Tigano III was placed in

custody, there was "a lot of yelling and other commotion" going on. (Docket No. 112 at page 81).

Higgins did not recall Joseph Tigano III making any statements about the guns found on the

premises. (Docket No. 112 at page 81). According to Higgins, after the interview, Joseph Tigano

III was taken outside, placed in a patrol car and transported to Buffalo for processing. (Docket

No. 112 at page 66).

Joseph Tigano, Sr. was also arrested at the time of the execution of the search warrant.

---

"second floor."

   [7] This appears to be what the other witnesses referred to as the "living room area."

   [8] On cross-examination, Higgins testified that he and Joseph Tigano III "were talking
about [Joseph Tigano III] taking marijuana down towards New York City and ... who would be
receiving the marijuana out in New York City? And the answer was 'I don't want to talk about
that.' " (Docket No. 112 at page 80).

(Docket No. 112 at page 12).  Nanna testified that he did not recall if he saw Joseph Tigano, Sr. inside the building, but did see him after he had been arrested and placed in a patrol car. (Docket No. 112 at page 27). According to Higgins, Joseph Tigano, Sr.  who was in the next room at that time the entry team was securing Joseph Tigano III. Higgins stated that Joseph Tigano, Sr.  was going back and forth, looking out the door, and didn't know what to do.  Higgins testified that Joseph Tigano, Sr.  appeared "kind of frightened" and "a little bit distraught." (Docket No. 112 at page 54). According to Higgins, Joseph Tigano, Sr.  was not initially compliant with commands to come out of the room. Higgins testified that members of the SWAT team eventually secured Joseph Tigano, Sr.; he was "briefly" placed on the floor and then "because of his age and what [Higgins'] observations were, [they] got him immediately up and into a chair." (Docket No. 112 at page 56). Higgins stated that Joseph Tigano, Sr.  was wearing blue shorts and a red tank top. (Docket No. 112 at page 98). Shortly thereafter, Joseph Tigano, Sr. was placed in a patrol car. (Docket No. 112 at page 58).  Higgins testified that the Erie County SMART team, comprised of medical personnel, also participated in the execution of the search warrant. (Docket No. 112 at page 61). At some point, Higgins was advised that Joseph Tigano, Sr.  had a medical issue. (Docket No. 112 at page 61). Higgins stated that he went outside and spoke with Joseph Tigano, Sr., who advised Higgins that he had a colostomy bag and needed some "equipment."  (Docket No. 112 at pages 62-63).  According to Higgins, at that time, Joseph Tigano, Sr.  kept asking "what was going on" and Higgins advised him that they were executing a search warrant. Higgins testified that he asked: "Why don't you tell me what's going on?"  To which Joseph Tigano, Sr. alleged responded: "I don't know anything, I just work for my son." (Docket No. 112 at page 64). Higgins stated that this was the extent of their conversation and that he told Joseph Tigano, Sr.

7

that if he needed anything he should just ask one of the officers to come and get Higgins. (Docket No. 112 at page 64).  On cross-examination, Higgins denied having any knowledge, prior to July 8, 2008, that Joseph Tigano, Sr.  had health problems, or was considered mentally limited. (Docket No. 112 at page 83).  Higgins acknowledged that Joseph Tigano, Sr. appeared confused at the time he was placed into custody and that he was trembling. (Docket No. 112 at page 85). When Joseph Tigano, Sr. advised Higgins of his colostomy bag and that he did not take his medication, Higgins did not bring him to the SMART team or ask any of the medical professionals to attend to Joseph Tigano, Sr.  (Docket No. 112 at page 89). Higgins stated, however, that he did advised Joseph Tigano, Sr.  that medical personnel were available at the scene, but that Joseph Tigano, Sr. did not request the assistance of the medical personnel. (Docket No. 112 at page 94).   Higgins testified that although 45 to 50 officers participated in the execution of the search warrant, only 18 members of the team went up to the second floor, and only two to four had direct contact with the defendants, respectively. (Docket No. 112 at page 95).   Higgins acknowledged that the other officers on the floor could be seen moving about the "small hall" as they swept the second floor at the time Joseph Tigano, Sr. and Joseph Tigano III were taken into custody. (Docket No. 112 at pages 97-98).

### Discussion

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). In Miranda, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first

8

warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived

that right. United States v. Holley, 2011 WL 4565041 (W.D.N.Y. 2011)(Payson, M.J.) citing

Miranda, 384 U.S. at 444.

> Custodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

United States v. Rodriguez, 356 F.3d 254, 258 (2d Cir.2004) citing United States v. Morales, 834

F.2d 35, 38 (2d Cir.1987) (internal citations omitted)).

It is not disputed that each of the defendants was in custody at the time they made the

alleged statements attributed to them.  With respect to Joseph Tigano III, the record reflects that

Nanna advised Joseph Tigano III of his rights under Miranda prior to the interview in which the

alleged statements were made. Nanna testified that he advised Joseph Tigano III of his rights and

that Joseph Tigano III acknowledged that he understood his rights  (Docket No. 112 page 8).

Clark testified that he observed Nanna advise Joseph Tigano III of his rights and that Joseph

Tigano III stated that he understood them. (Docket No. 112 at page 42). The Court finds the

testimony of Nanna and Clark credible on this issue.  The defendant contends that any waiver of

his rights under Miranda was not voluntarily made (Docket No. 115 at page 11). Referring

generally to the "myriad of psychological issues suffered" by Joseph Tigano III, the defendant

argues that the waiver of his rights was not voluntary because it was made in the presence of four

armed officers while numerous other officers conducted a search of the warehouse.  (Docket No.

115 at page 11-12).

A valid waiver of <u>Miranda</u> rights requires two elements: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moron v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir.1995). The court looks to the totality of the circumstances to determine if there was "both an uncoerced choice and the requisite level of comprehension." <u>Moron</u>, 475 U.S. at 421; <u>Jaswal</u>, 47 F.3d at 542. In assessing the effect of a defendant's mental status on a waiver of <u>Miranda</u> rights, the question is whether the statements were the product of a "rational intellect" and "free will." See <u>Mincey v. Arizona</u>, 437 U.S. 385, 398 (1978). The nature of the statements made by defendant—whether they were clear, thorough, etc.—can demonstrate the defendant's level of awareness. See <u>Pagan v. Keane</u>, 984 F.2d 61, 63 (2d Cir.1993).

Upon review of the totality of the circumstances, as developed in this record, the Court finds that the defendant's waiver of his rights was voluntary.  The Court notes that although there is the suggestion in the record that Joseph Tigano III has suffered from some psychological issues, there is no evidence suggesting that his mental state at the time of his arrest was deficient in any manner. There is no evidence that Joseph Tigano III was under the influence of drugs or alcohol. Although there were several officers conducting a search of the warehouse, at the time of the interview, Joseph Tigano III was in a room with four officers. There is no evidence that any of the officers took any actions to coerce the defendant in any way. Although the officers were armed, there is no evidence that they took there weapons out of their holsters and threatened

the defendant with them. There is no suggestion in the record that Joseph Tigano III was verbally threatened or physically intimidated.  The testimony reflects that the defendant understood the questions being posed to him, and that he agreed to answer some questions, and refused to answer other questions.  In sum, the evidence reflects that Joseph Tigano III understood his rights, as he was advised, and that he understood the consequences of waiving those rights. The motion to suppress the statements made by Joseph Tigano III should be denied.

Based upon a review of the totality of the circumstances, the Court finds that the alleged statement made by Joseph Tigano, Sr. to Higgins should be suppressed.  It is undisputed that Joseph Tigano, Sr. was in custody at the time the statement was made. It is also undisputed that Joseph Tigano, Sr. had not been advised of his Miranda rights prior to making the alleged statement. The government argues that, nonetheless, the statement should not be suppressed because Higgins' question to Joseph Tigano, Sr. was not one reasonably likely to elicit an incriminating response. (Docket No. 119 at page 3). However, the record reflects that, under the circumstances, it was reasonably likely that the question posed to Joseph Tigano, Sr. would elicit an incriminating response.  Higgins, by his own testimony, was aware that Joseph Tigano, Sr. was confused and distraught at the time of his arrest. In fact, in light of Joseph Tigano, Sr.'s advanced age and emotional state, Higgins testified that he took steps to place the defendant in a chair, and ultimately have him taken to a patrol car.  (Docket No. 112 at pages 54-56).  Higgins' question to Joseph Tigano, Sr. asking him to tell Higgins "what was going on" as almost 50 agents were all over the warehouse, having already found the existence of a marijuana grow operation, was clearly a question likely to elicit an incriminating response.  Thus, the alleged statement made by Joseph Tigano, Sr.  to Higgins should be suppressed.

**Conclusion**

The respective motions to suppress should be granted in part and denied in part,

consistent with the above.

Pursuant to 28 U.S.C.  §636(b)(1), it is hereby ordered that this Report &

Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the

Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk**

**of this Court within fourteen(14) days after receipt of a copy of this Report &**

**Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the**

**Federal Rules of Civil Procedure, as well as W.D.N.Y.  Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION**

**WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO**

**FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER**

**BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED**

**HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v.

Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir.

1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil

Procedure, and W.D.N.Y.  Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v.

Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y.  Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
December 15, 2011

13